DISTRICT 2 MARINE ENGINEERS BENEFICIAL ASSOCIATION—ASSOCIATED MARITIME OFFICERS, AFL–CIO, Plaintiff,

v.

PUERTO RICO MARINE MANAGEMENT, INC., Defendant.

No. 81 Civ. 5321(MEL).

United States District Court, S.D. New York.

June 21, 1983.

O'Donnell & Schwartz, New York City, for plaintiff; Joel G. Glanstein, New York City, of counsel.

Zelby & Burstein, New York City, for defendant; Herbert Burstein, New York City, of counsel.

LASKER, District Judge.

This action to compel arbitration and for appointment of an arbitrator concerns the discharge on August 20, 1981 of the licensed marine engineers employed on two ships, the S.S. Mayaguez and the S.S. Aquadilla, owned by defendant Puerto Rico Marine Management, Inc. ("PRMMI"). The factual background, which is set forth in somewhat greater detail in an earlier opinion,[1] may be summarized as follows.

The collective bargaining agreement between PRMMI and District 2 Marine Engineers Beneficial Association—Associated Marine Officers AFL–CIO ("District 2"), the union that represents the discharged employees, expired on June 15, 1981. Because a new agreement had not yet been negotiated, PRMMI and District 2 agreed, through an exchange of correspondence, to extend the agreement pending negotiations. District 2's mailgram, which was sent on June 11th, stated:

> "This is to advise that the contract between your Company as owners and/or operators and this union is extended beyond the expiration date of June 15, 1981. This extension can be cancelled by the union by giving 24 hours written notice. Please confirm your agreement."

(Pl.Ex. 2).

PRMMI's response was sent the following day:

> "This is to confirm our agreement with your telex of 6/11/81 extending our present contract between your union and this Company beyond the expiration date of June 15, 1981."

(Pl.Ex. 3).[2]

On July 17, 1981 District 2 mailed a proposed amended agreement to PRMMI for its approval (Pl.Ex. 5). PRMMI rejected the proposed agreement on August 18, 1981, and purported to terminate the collective bargaining agreement, with the following letter:

> "Puerto Rico Marine Management, Inc. (PRMMI) does not agree with such proposals. Therefore, PRMMI gives notice of not renewing the Collective Bargaining Agreement and hereby terminates all collective bargaining agreements, together with all supplementary Memorandums or Agreements between the parties, if any, with MEBA-District 2."

(Pl.Ex. 7). On August 20, 1981 PRMMI discharged the licensed marine engineers represented by District 2. After its demand for arbitration of the discharges was

---

1. Opinion of April 21, 1982, 537 F.Supp. 813.

2. Pl.Exs. 2 and 3 will occasionally be referred to collectively as the "Extension Agreement."

rejected by PRMMI, District 2 filed this action to compel arbitration under the terms of the collective bargaining agreement.

In our earlier opinion we denied cross motions for summary judgment, holding that a factual issue existed as to whether PRMMI's purported termination of the collective bargaining agreement was effective and thereby relieved it of the duty under the agreement to arbitrate grievances. We found unpersuasive District 2's contention that it had the sole authority to terminate the collective bargaining agreement on 24 hours' notice and that PRMMI had agreed to be perpetually bound by the agreement as long as District 2 chose not to terminate. We also rejected PRMMI's argument that it was free to terminate the agreement at will, finding this contention to be inconsistent with the language of the Extension Agreement and the context in which the parties agreed to the extension:

"[T]he purpose of the extension agreement here was to allow the parties to negotiate toward a new agreement while enjoying the protections of the prior agreement. Such a purpose suggests that the extension was intended for a reasonable time during which negotiations would take place. It also suggests that the good faith negotiations would occur, with a view toward reaching agreement on another contract, and that termination would not occur without reasonable notice by the terminating party. The determination whether these conditions are met depends on the circumstances and practices of these particular parties and this particular industry."

(Opinion of April 21, 1982, at 816).

It should be emphasized that this case does not involve a question of the statutory duty to bargain in good faith within the meaning of Section 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5), ("the Act") since the licensed engineers discharged by PRMMI were supervisory personnel rather than employees within the meaning of the Act. The question instead is whether there was a contract in existence on August 20, 1981, the date of the discharge, which obligated the parties to arbitrate the issue of whether there was cause for the discharges.

At a factual hearing held to develop the issues framed above, both parties presented testimony by individuals who were respectively responsible for contract negotiation on their behalf in 1981 and who were familiar with the events leading up to the discharge of the licensed marine engineers: for District 2, Jerome Joseph, vice-president for deep-sea operations, and for PRMMI, Luis Colon, director of industrial relations for PRMMI. Both parties also submitted documentary evidence.

Jerome Joseph has occupied his position as vice-president for deep-sea operations since 1979, and previously was employed as assistant to the president. His duties in both positions included responsibility for contract negotiations, grievance proceedings, and arbitration matters. Joseph was extensively involved in contract negotiations between deep-sea employers and District 2 in 1981 and 1978, and was involved to a lesser extent in 1975. Joseph's testimony as to the customary procedure for contract negotiation, which was not disputed by Colon in any of its essential details, and which we credit, was as follows.

Although District 2 entered into individual contracts with each deep-sea employer, District 2 negotiated with the employers as a group (Tr. 54–56). The agreements had a duration of three years, and expired on June 15th of the termination year (Tr. 43). When an agreement was due to expire, District 2 was obligated, pursuant to the terms of the agreement, to give 60 days' notification of the expiration and of District 2's intent to renegotiate the agreement (Tr. 9). For at least the last three negotiations, in 1975, 1978 and 1981, the then-existing agreements were extended beyond the June 15th expiration date because negotiations for a new agreement had not yet been concluded (Tr. 43–44).

The deep-sea employers, though they did not bargain as a formal employers' association, appointed an informal chairman who

met with representatives of District 2 to discuss proposed modifications to the existing collective bargaining agreement (Tr. 10, 17–18). When these preliminary discussions were completed, a meeting was held to which most of the employers sent representatives; in 1981, this meeting was held on July 16 (Tr. 18). At the meeting the District 2 representatives presented to the employers a memorandum of understanding amending the existing agreement, and then left the room to permit the employers to exchange views on the proposed agreement. Counter-proposals were then exchanged, and usually by the end of the day an agreement was reached. Some employers signed the amended agreement at the conclusion of the meeting; others took the agreement with them for further study and signed it later. Copies of the proposed amended agreement were mailed to employers who did not attend the meeting (Tr. 19–20).

In 1981 PRMMI did not send a representative to the meeting at which the amended agreement was presented to the employers. Following the meeting Joseph mailed a copy of the proposed agreement to PRMMI (Pl.Ex. 5). Joseph also called Captain James Shinners, vice president for vessel operation at PRMMI, who had handled negotiations for PRMMI in 1978, and inquired about his absence from the meeting. Shinners explained that he had been out of town at the time (Tr. 21). Joseph spoke to Shinners again on August 14th to ask why District 2 had not yet received a signed agreement from PRMMI. Shinners referred Joseph to Luis Colon (director of Industrial Relations for PRMMI), who told Joseph that PRMMI's lawyers were meeting to go over the proposed agreement and that Colon would contact Joseph after that meeting (Tr. 21–23). On August 19th Joseph received the letter quoted earlier stating that PRMMI did not agree with District 2's proposals and that PRMMI was terminating the agreement (Pl.Ex. 7). Joseph sent a telex that same afternoon asking PRMMI

to identify the portions of the proposed agreement with which PRMMI disagreed; PRMMI did not send a response (Tr. 24; Pl.Ex. 10). The engineers represented by District 2 were discharged on August 20th.

Colon testified that PRMMI had terminated the agreement with District 2 because on August 3rd PRMMI had signed a collective bargaining agreement with District 1 Marine Engineers Beneficial Association, pursuant to which District 1 was claiming the right to represent the licensed engineers on all of PRMMI's ships, including the Mayaguez and the Aquadilla (Tr. 171, 178–83). Colon admitted that PRMMI made no attempt to negotiate with District 2 over the jurisdictional issue before terminating the agreement (Tr. 183–84).[3] Colon testified that he thought the terms of the proposed agreement were not open to negotiation, but instead that PRMMI either had to accept or reject the entire proposal. However, this testimony was not based on personal knowledge of bargaining practices between District 2 and PRMMI, but rather on what he had been told by Shinners and by PRMMI's attorney (Tr. 196). Colon had not directly participated in any of the past contract negotiations between PRMMI and District 2 (Tr. 188). Joseph's testimony established that employers did on occasion raise objections to the proposed agreement after the negotiating meeting had been concluded and that such objections sometimes resulted in modification of the agreement (Tr. 45–47).

In light of the evidence as to the custom of the parties and of the industry in negotiating collective bargaining agreements, it is clear that the parties' Extension Agreement must be construed as contemplating a good-faith effort by the parties to resolve their differences concerning the new proposed agreement during the period of the extension. The evidence is also clear that such an effort was not made by PRMMI.

---

**3.** When District 1 learned of the dispute between District 2 and PRMMI, District 1 demanded arbitration of the jurisdictional issue. On August 21st the arbitrator found that the agreement between District 1 and PRMMI covered all of PRMMI's vessels. District 2 also demanded arbitration of the discharges, and filed this lawsuit when its demand was refused.

In order for District 2 to prevail, however, it was also necessary for District 2 to show the intended duration of the extension period, since it would be unreasonable to assume that PRMMI's failure to negotiate with District 2 could forever prevent the termination of the collective bargaining agreement. Little evidence was introduced on this issue. The evidence that was presented indicated that a new contract was customarily negotiated between District 2 and the employers approximately a month after the old agreement was extended, and that any modifications suggested after conclusion of the bargaining session would be made within a short time after the meeting. Even if the Court were to infer that a 60-day extension was contemplated, based upon the fact that 60-day periods are commonly used in the collective bargaining context, the discharge of the engineers on August 20th occurred more than 60 days after the contract's expiration date.

District 2 argued in its summation that PRMMI's failure to negotiate left the prior collective bargaining agreement in effect until PRMMI sold the Mayaguez and the Aquadilla in September 1982. This argument assumes, however, that the extension of the agreement would have continued indefinitely if the ships had not been sold, an assumption which, as noted above, is not reasonable. In any event, District 2 offered no evidence in support of this interpretation of the Extension Agreement.

Based on the lack of evidence, in light of past practices of the parties, that the extension of the contract encompassed a period beyond the date on which the employees were discharged, it follows that District 2 has not sustained its burden of proof that the contract was in existence on that date. Accordingly, its petition to compel arbitration is dismissed.

It is so ordered.